In re CONTINENTAL PROPERTIES, INC., Debtor.

BLACKFIELD HAWAII CORPORATION, Plaintiff,

v.

CONTINENTAL PROPERTIES, INC., Defendant,

and

Travelodge International, Inc., Intervenor.

Bankruptcy Nos. 81–00436, 81–0091.

United States Bankruptcy Court, D. Hawaii.

Jan. 4, 1982.

James H. Lawhn, Honolulu, Hawaii, for intervenor.

John R. Dwyer, Jr., Honolulu, Hawaii, for defendant.

Ke-ching Ning, Honolulu, Hawaii, for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JON J. CHINEN, Bankruptcy Judge.

The above-entitled complaint to lift stay having come on for trial beginning on October 19, 1981, and the Court, sitting without a jury, having considered the witnesses and evidence presented by the parties, makes the following findings of fact and conclusions of law.

1. Defendant Continental Properties, Inc. (hereinafter "Continental") is a Hawaii corporation.

2. Plaintiff Blackfield Hawaii Corporation (hereinafter "Blackfield") is a Hawaii corporation.

3. Intervenor Travelodge International Inc. (hereinafter "Travelodge") is a foreign corporation authorized to do business in the State of Hawaii.

4. Blackfield holds the master lease to property located at Coconut Plantation, Kauai, Hawaii. On July 1, 1969, Blackfield subleased a portion of the master leased property to Travelodge. The property under said sublease is referred to herein as "Property". The sublease required the lessee to build on the Property a first-class resort hotel which would consist of no less than 190 or more than 340 hotel rooms.

5. On October 3, 1978, Continental and Travelodge executed a DROA for the sale and purchase of Travelodge's interest in the Property for $700,000.

6. The Court has heard and considered testimony of two appraisers, Irmgard Patterson on behalf of Blackfield, and Alan Conboy on behalf of Continental. The facts show that Mrs. Patterson, who is an MAI, spent considerable time in doing research studying the Travelodge lease and the economic conditions in Hawaii and arriving at her opinion as to the market value of the Travelodge lease.

7. In her appraisal report, Mrs. Patterson discussed the three methods of apprais-

al: the reproduction cost approach, capitalized value or income analysis approach, and the market comparison approach. Mrs. Patterson stated that the reproduction cost approach was not used in the instant case because the Property is a vacant site. She then went into a detailed analysis of the income analysis approach and the market data approach.

8. In the market data approach, to arrive at the value of the land, in fee simple, as though unencumbered by any lease, Mrs. Patterson set forth in her report six comparables. Three of the comparables are located within the Coconut Plantation resort.

9. Transaction No. 1, also known as the Hirano site, adjoins the property in question. That leasehold, owned by Mr. Hirano and Mr. Hayashi, has been on the market for over a year with an asking price of $600,000. However, it remains unsold. The owners of the lease offered to return the lease to Blackfield free, but Blackfield has refused the offer, demanding payment for nonperformance.

10. Transaction No. 2 is also within the Coconut Plantation resort. A hotel has been constructed on the property and it is now under the management of the Sheraton chain.

11. The third comparable in the Coconut Plantation resort is Transaction No. 6. Mrs. Patterson pointed out that, although this property is not on the beach, it is relatively small, with a good potential for restaurant use, and in close proximity to hotels and other resort facilities.

12. Transactions 3 and 4 are at Hanamaulu, Kauai. These two sites are along a beach, but compared to the subject property, have narrow beach frontage.

13. Transaction 5 is at Kapaa and is a condominium project.

14. Based on a study of these transactions, Mrs. Patterson arrived at the following value per square foot for each of the comparables:

Transaction 1—$3.78;
Transaction 2—$6.69;
Transaction 3—$5.30;
Transaction 4—$8.60;
Transaction 5—$5.29;
Transaction 6—$6.68.

15. Based upon this market data analysis, Mrs. Patterson arrived at about $8.50 for the Property, giving it a fee simple, unencumbered value of $4,000,000. By capitalizing this $4,000,000 at 8.5 percent, Mrs. Patterson arrived at an average percentage ground rent of $350,000.

16. To check on the result of her comparative approach, Mrs. Patterson used the anticipated income analysis approach. She carefully reviewed various leases, economic conditions, and the condition of the tourist industry in the islands, and finally concluded that for 324 rooms on the subject site, a percentage rate of four for rooms, one for food, three for beverages, and ten for concessions was proper. Based on this percentage applied to the projected gross revenue, she arrived at an annual rental attributable to the land at $355,200.

17. Based on 190 rooms, Mrs. Patterson used a higher percentage rate of 6.821, 1.705, 5.116, and 17.052 for rooms, food, beverages and concessions. Based on this higher percentage rate, she arrived at an annual rental attributable to land at $358,714.

18. Mrs. Patterson then compared the market data investigations and anticipated income analyses and estimated the ground rent to be $350,000. With this $350,000 as the estimated annual economic rent, Mrs. Patterson estimated the subleasehold interest to be $285,000 after the completion of the hotel on the site with a strong operator in charge.

19. She next analyzed the Hirano lease on the adjoining property where the lease had been on sale for $600,000 for over a year without any buyers.

20. Mrs. Patterson then pointed out that under the Travelodge lease the sublessee has the right to construct a building on the subject site. This right may have value. But she also is of the opinion that the sublease may be a liability in today's market. In today's market it requires payment

of minimum rent, $86,000 per annum, and real property taxes for a total of $100,000 a year. Because of the high cost of financing, high construction cost, and the weak tourist industry, especially on the neighbor islands, the sublessee may not obtain reasonable financing, and the sublease may become subject to default by reason of non-performance. Thus, Mrs. Patterson is of the opinion in the instant case that the present value of the Travelodge lease is nominal, up to $10,000, especially because of the poor economic condition, the high rate of interest, high cost of construction, lack of reasonable financing, a short construction period in the lease, and the declining tourist industry, especially on the outside island.

21. Mrs. Patterson felt that, even if the subject property had been appraised on the basis of a condominium use, it made no difference in the result because of the present economic condition and other matters she has previously stated.

22. Mr. Conboy, a SRPA, and candidate for MAI, spent approximately 25 hours to arrive at the value of the Travelodge lease and turned in a one-page analysis in which he estimated the value of the Travelodge lease to be worth $905,370. However, in this one-page report, Mr. Conboy's analysis is based on the wrong assumption. He has assumed that the subject property is already improved with a hotel with a base of income. He does not state the costs of constructing the hotel, nor the high rate of interest for financing.

23. In addition, in arriving at his opinion on the market value of the lease, Mr. Conboy used the percentage rate based on the Waiohai lease on Kauai and the Hyatt Regency and Marriott leases at Kaanapali. The Waiohai lease is actually a lease between Amfac and Amfac. The lessee is controlled 80% by Amfac. This is a sweetheart deal and does not appear to be comparable.

24. The situation at Kaanapali, Maui, is not similar to the situation at Kauai. Kaanapali is a very successful resort area and has a greater percentage of tourists than Kauai. The Court does not find the leases for the Hyatt and the Marriott hotels to be proper comparables on Kauai.

25. Mrs. Patterson believes, and the Court agrees, that the lease for the Pacific Holiday Hotel in the Coconut resort area should be used as a comparable in this case, not the leases from Maui.

26. The Court notices that most of Mr. Conboy's time was spent in analyzing and tearing apart Mrs. Patterson's report. Mr. Conboy did not spend much time in preparing his own analysis.

27. Mr. Conboy criticized Mrs. Patterson's report on several grounds. He contended that, though Mrs. Patterson acknowledged that the best use of the subject property could be for condominium use, she did not appraise the property based on such use; that she based the appraisal on the hotel use. Mr. Conboy also contended that in using Transactions 3 and 4 as comparables, Mrs. Patterson did not adjust for the physical characteristics of those two properties. Mr. Conboy pointed out that the property at Hanamaula, Kauai are long and narrow and have a narrow beach frontage, compared to the subject property which is rectangular with a wide beach frontage. However, Mr. Conboy did not say how the adjustment should be made and Mr. Conboy acknowledged that if he had done a full value report, covering approximately two weeks, he may have reached a different conclusion as to the value of the Travelodge lease.

28. In addition to the opinions rendered by Mrs. Patterson and Mr. Conboy, the Court notices that, in its schedule, Continental has listed the Travelodge lease at a value of approximately $500,000.

29. The Court also notices that Blackfield offered to purchase the Travelodge lease from Continental for the sum of $200,000.

30. Between Mrs. Patterson and Mr. Conboy, the Court finds that Mrs. Patterson has more thoroughly and more adequately researched, studied and analyzed the appraisal problem. The Court places more credence on her report.

31. After reviewing all of the evidence presented, the Court relies on Mrs. Patterson's report. Because of the present economic condition, the high rate of interest, and decline in the tourist industry, a value of $8.50 per square foot for the subject parcel appears reasonable. Mrs. Patterson stated that Transaction No. 4 was negotiated when real estate prices were at their peak on Kauai. This Court feels that, because of the present poor economic situation, the declining tourism, and the high rate of interest, even if adjustment is made for the physical characteristics of the subject properties and even if we assume the highest advantage of the subject property is for condominium, $8.50 a square foot, or thereabouts, is a fair figure.

32. The Court also accepts Mrs. Patterson's analysis of the income analysis approach, and the Court thus accepts Mrs. Patterson's conclusion that the present market value of the Travelodge lease is nominal. The situation surrounding the property substantiates Mrs. Patterson's opinion that the Travelodge lease has only nominal value. The Hirano lease is similar to the Travelodge lease. The Hirano property is adjoining the subject property, and both properties are very similar in physical characteristics. Hirano and Hayashi, who own the lease, are large developers in Hawaii, with good track records. However, they have not been able to put up a hotel or condominium on this property. They have offered the property for sale for over a year at $600,000 but have not received any offers to purchase. In fact, the Hirano lease has been offered to Blackfield to be returned without any cost.

33. The Court feels that the foregoing facts surrounding the Hirano property substantiate Mrs. Patterson's opinion that, because of all the surrounding circumstances in the instant case, the high rate of interest, declining tourism, the general economic conditions, the subject Travelodge lease has only nominal value today. Since the Court finds the market value of the Travelodge lease to be nominal value, say $10,000, and since Continental must pay $700,000 to Travelodge for the lease, the Court finds there is no equity to Continental in the property.

34. As to whether or not the subject property is necessary to effective reorganization: Continental originally sought to reorganize itself with three leasehold properties, a Waikiki property, a Hilo property, and the subject Kauai property. However, this Court has earlier ruled that Continental has no interest in the Waikiki and Hilo properties. Without those two properties, Continental cannot formulate an effective plan of reorganization.

35. Though the subject property is necessary for any reorganization, under the facts of this case, the Court does not believe that Continental can present an effective reorganization.

36. Continental only asserted possible contingency plans. No definite plans have been submitted.

37. Finally, it is the burden of Continental to show adequate protection for Blackfield. Continental has not presented any evidence to show how it would adequately protect Blackfield. It only stated that it will provide protection after Blackfield consents. There is no evidence to show that Continental can adequately protect Blackfield. Mr. Luke of Continental acknowledged that, if Continental did not pay, Blackfield will lose money. Blackfield must continue to pay the fee owner, and it must pay taxes and other costs.

38. When the lease was executed in 1969, water was available. No one was concerned as to who was responsible for furnishing water. Thus, the lease was drafted accordingly. The lease and the amendment of 1970 clearly show that Blackfield was required to provide only the "facilities" for the utilities for the property, one of the utilities being water. The Court thus finds that Blackfield was not required to provide water when the lease was executed in 1969 and amended in 1970.

39. The Court further finds that Travelodge and Continental had requested consent of Blackfield in 1978. At that time water was available for the property. However, Blackfield did not consent and in a State

trial a jury found the refusal to consent to be unreasonable. If this verdict is not reversed or overruled, the Court is of the opinion that Blackfield's refusal has caused the present water problem. The Court finds that Blackfield is responsible for providing water, if the jury verdict stands.

40. However, the Court feels that the water issue has no bearing in the result of this case. Even if Blackfield is found responsible for supplying the well and water because of its failure to consent in 1978, the Court still finds there is no equity for Continental in the Travelodge lease.

## CONCLUSIONS OF LAW AND ORDER

1. This Court has jurisdiction over this matter and over the parties in this action.

2. Under Section 362(d) of the Bankruptcy Code, there is no adequate protection for Blackfield as Continental failed to provide any evidence and carry its burden of proof to how it could adequately protect Blackfield.

3. Under said Section 362(d), the Court also concludes that there is no equity for Continental in the Travelodge lease in that Continental agreed to purchase the Travelodge lease for $700,000 and appraisal testimony has shown the Travelodge lease to have only nominal value.

4. The Court also concludes that Continental has no effective plan of reorganization without the Hilo and Waikiki properties. Furthermore, Continental has no effective plan to reorganize by utilizing only the Kauai property.

5. Consequently, the Court concludes that the stay should be lifted and,

IT IS HEREBY ORDERED that it be lifted.